**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2026 IL App (3d) 250112-U

Order filed July 20, 2026

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2026

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the Circuit Court |
| | ) | of the 18th Judicial Circuit, |
| Plaintiff-Appellee, | ) | Du Page County, Illinois, |
| | ) | |
| v. | ) | Appeal No. 3-25-0112 |
| | ) | Circuit No. 20-CF-1974 |
| | ) | |
| ROBERT F. EBEL, | ) | Honorable |
| | ) | Judge Margaret O'Connell, |
| Defendant-Appellant. | ) | Presiding. |

_____

JUSTICE BRENNAN delivered the judgment of the court.
Justices Peterson and Davenport concurred in the judgment.

_____

**ORDER**

¶ 1     *Held*: The trial court properly considered all relevant evidence in mitigation and aggravation and did not abuse its discretion in sentencing defendant. Affirmed.

¶ 2     Defendant, Robert F. Ebel, pled guilty to one count of aggravated driving under the influence causing death (625 ILCS 5/11-501(a)(6), (d)(1)(F) (West 2020)) and crossing a designated median (*id.* § 11-708(d)). Defendant was sentenced to 12 years' imprisonment. Defendant challenges his sentence on appeal, arguing that the court improperly considered a factor

inherent in the offense during sentencing and that his sentence was excessive given the aggravating and mitigating factors presented. For the reasons set forth below, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4        On August 22, 2020, defendant was driving his Tesla southbound on I-55. A semi-truck was in the right-hand lane, and defendant drove onto the right shoulder of the road in an effort to maneuver around the semi-truck. John Exner's vehicle was stopped on the shoulder at that time. Defendant struck Exner's vehicle, causing injuries that ultimately resulted in Exner's death. Due to the extent of Exner's injuries, defendant voluntarily submitted to blood and urine testing. No volatiles were found in defendant's blood, but cocaine metabolite and cocaine were detected in his urine.

¶ 5        The State filed a felony complaint against defendant alleging, *inter alia*, one count of aggravated driving under the influence (DUI) causing death (*id.* § 11-501(a)(6), (d)(1)(F)), a Class 2 felony, as well as a citation and complaint for crossing a designated median (*id.* § 11-708(d)), a petty offense. Defendant was taken into custody and subsequently released with conditions after posting bond. As part of these conditions, defendant was ordered to "[n]ot possess or consume any controlled substances, except as medically prescribed, and submit to drug testing as directed by the Pretrial Unit." Defendant's bond was increased several times following various violations, and he was eventually taken back into custody.

¶ 6        Defendant ultimately pled guilty to one count of aggravated DUI causing death and one count of improperly crossing a dividing space on the roadway. Defendant was informed that the sentencing range for the aggravated DUI causing death count was 3 to 14 years in the penitentiary. *Id.* § 11-501(d)(2)(G). The court found a sufficient factual basis for defendant's plea, ordered a presentence report, and scheduled a sentencing hearing.

2

¶ 7    The presentence report included, in relevant part, defendant's statement that he had always been an aggressive driver and that his philosophy had been "if you buy a fast car then use it." He expressed remorse for the accident and Exner's death. He indicated that he had used one-half of a gram of cocaine the evening before the accident. He was previously arrested in 2009 for DUI and was sentenced to court supervision, which was successfully terminated in 2011. In June 2021 and December 2021, defendant checked himself into rehab and completed the recommended treatment programs. The report also included an incident report dated August 5, 2024, related to a physical altercation between defendant and another inmate, resulting in defendant serving 25 days of disciplinary segregation.

¶ 8    At the sentencing hearing, the State first called Sean Reeves, a former sergeant with the Illinois State Police who was assigned to investigate the accident. Reeves spoke with Richard Santiago, a civilian who approached the scene of the accident prior to first responders arriving. The State moved to admit a video recording of Santiago's interview, wherein he recounted approaching Exner's vehicle after the accident, observing his injuries, and attempting to render aid.

¶ 9    Reeves further explained that he had obtained a series of photographs from the cloud-based storage system from defendant's vehicle, which showed defendant's vantage point moments before and after the collision. The photographs show defendant's vehicle driving behind the semi-truck in the right-hand lane, pulling onto the shoulder of the road where Exner's vehicle can be seen, encroaching on Exner's vehicle, and then surrounded by debris as defendant's vehicle left the roadway following the collision.

¶ 10    On cross-examination, Reeves confirmed that defendant had not fled the scene, appeared cooperative, and had expressed "some" concern for Exner. Reeves also testified that defendant voluntarily surrendered following the issuance of a warrant for his arrest.

¶ 11    The State next called Nicholas Johnson, who was also traveling southbound on I-55 on the day of the accident. Johnson testified that he "immediately" noticed an "aggressive Tesla" driven by defendant. He described defendant's driving as follows:

> "Very aggressive, multiple lane changes, abrupt lane changes where the whole vehicle jerks. There is the sudden side-shift motion. Multiple vehicles had to hit their brakes to avoid. I am talking paper thin gaps on the lane changes. Multiple people had to back off their speed because of his driving."

Johnson saw defendant drive onto the shoulder of the road, at which point he observed "a massive acceleration in the vehicle." Johnson's view of defendant's vehicle was obstructed by the semi-truck, but he noticed the scattering of dust and debris, as well as a change in the traffic pattern.

¶ 12    Johnson pulled over and exited his vehicle, and he noticed Exner's vehicle "90 degrees to the direction of traffic. So it was in the grass portion of the shoulder pointing directly at traffic." Johnson recounted having to cut the airbags off of Exner's passenger window to gain access to him. He described Exner's injuries and condition. Johnson was then alerted to another vehicle in the tree line, where he located defendant in his vehicle. He described defendant as follows:

> "He was very, very, relaxed for what had just happened. I had asked a question. I was like hey, are you okay. He didn't answer me, didn't acknowledge my presence at all. He was on the phone. I could hear him asking for the tow truck, doesn't matter about the car, it's total[]ed, just give me a ride home."

4

When asked whether defendant showed any concern for Exner, Johnson responded, "Absolutely not." On cross-examination, Johnson testified that he had not informed defendant of Exner's condition and did not know whether defendant had seen Exner or his vehicle.

¶ 13   The State then called Tyler Terrazas, a certified traffic crash reconstruction officer with the Illinois State Police. Terrazas testified that the posted speed limit at the location of the accident was 55 miles per hour. Terrazas responded to the scene, located Exner's vehicle, and observed his injuries. Terrazas then located defendant and noted that he did not have any serious injuries. The fire department arrived and had to extricate Exner from his vehicle, which took approximately 15 minutes.

¶ 14   Terrazas further testified that he had reviewed audio and visual recordings of statements defendant made while seated in a squad car at the scene, and they were admitted into evidence. One of the videos showed defendant explaining that he was weaving through traffic and did not initially see Exner's vehicle on the shoulder. Upon seeing Exner's vehicle, defendant thought he could fit between the gap created by the semi-truck in the right-hand lane and Exner's vehicle on the shoulder but that he failed to do so. He stated, "It's a hundred percent my fault. I was driving recklessly trying to get my daughter. It was ridiculous and stupid, and my kids always yell at me for doing it. And, um, here I am. Sixty thousand [unintelligible]." It was later clarified that the unintelligible portion of the video was in reference to the price of defendant's Tesla.

¶ 15   Terrazas did not observe any overt signs of drug impairment during his interaction with defendant but noted that drug impairment is more difficult to detect than alcohol impairment. Defendant can be seen on another squad car video stating that he had not consumed any alcohol prior to the accident and that he only took prescription medication. While still at the scene and seated in a squad car, another video showed defendant discussing the speed of his Tesla, as well

5

other vehicles he previously owned, and indicating that he had driven as fast as 120 miles per hour on a separate occasion. When read the warning to motorists and asked whether he would submit to blood and urine testing, defendant stated that he had a medical marijuana card and had smoked the night prior. Defendant ultimately agreed to the testing.

¶ 16 Terrazas explained that both Exner's and defendant's vehicles were equipped with event data recorders (EDRs), which captured each vehicle's activity for the five seconds immediately preceding the airbag deployment. Exner's EDR showed that his vehicle was stopped until the moment of impact. Defendant's EDR showed that he was traveling at approximately 73 miles per hour 5 seconds before the collision, approximately 86 miles per hour 2.5 seconds before the collision, and 96.9 miles per hour at the time of the collision. During those five seconds, defendant's EDR showed no attempt at braking. Also admitted into evidence were photographs showing the scene of the accident, as well as extensive damage to the vehicles.

¶ 17 On cross-examination, Terrazas agreed that defendant's increasing speed in the five seconds before the collision "was an effort to get in the hole between the truck, in front of the truck actually, so he wouldn't strike the car that was parked on the shoulder ***." Terrazas further confirmed that defendant was "cooperative and polite." He testified that he did not inform defendant of Exner's condition, but defendant was aware Exner was transported to the hospital for injuries. With respect to defendant's submission to blood and urine testing, the court stated for the record (based on prior proceedings) that defendant requested catheterization at the hospital in an effort to comply with the urinalysis and that the catheterization took two attempts. Terrazas agreed that this was "extraordinary cooperation" that he had never experienced before.

¶ 18 Randolph Reed, a Du Page County pretrial services officer who was assigned to defendant, testified as the State's next witness. Reed monitored the conditions of defendant's release from

custody. Reed recounted defendant's several bond violations, including tampering with a drug patch, failure to report for testing, and positive drug tests for cocaine. On cross-examination, Reed confirmed that defendant did not test positive for a controlled substance while he was in treatment and that relapses are not uncommon for individuals who struggle with substance abuse.

¶ 19    The State also introduced an audio excerpt of a phone call between defendant and his son while defendant was in jail. During the call, defendant's son indicated that, when asked by others how long defendant would remain in custody, his son's response was that he did not know. Defendant responded, "Like who?" Defendant's son responded that he had mentioned to his friends that his father was in jail. Defendant laughed and asked whether his son told them that defendant got in an accident and killed someone. Defendant continued, "I mean, you didn't say like DUI. I mean, I don't, I didn't get a DUI." When his son questioned this, defendant responded that it technically was a DUI but that he was not impaired. Defendant stated that, in any other state he "would have been fine" and that it was "complete bull***."

¶ 20    The court heard multiple victim impact statements from Exner's family.

¶ 21    In mitigation, defendant presented letters confirming his completion of the two rehabilitation programs, character letters, and expert testimony. Defendant called Dr. James O'Donnell, a pharmacologist, as his expert witness. O'Donnell testified that he reviewed the accident report, toxicology reports, squad car videos of defendant, hospital and medical records, police reports, and relevant literature. He also interviewed defendant. From there, O'Donnell concluded that defendant was not impaired at the time of the accident. He testified that the signs of cocaine intoxication—hyperactivity, dilated pupils, rapid speech, flight of ideas, and incoherence of speech—were not present in defendant immediately following the accident.

7

¶ 22    O'Donnell continued that a substance detected in urine cannot be used to conclude how the drug is impacting the body, as "the bladder is for all intents and purposes outside the body," and substances in the bladder are not absorbed. The cocaine metabolite was merely evidence that the drug had been used *at one time*, up to three days prior for the occasional user. O'Donnell explained that the only way to infer a drug's impact on the body is if a certain quantity is in the *blood* in its active form. "Since we have no cocaine in the blood, there is no possible cocaine effects on the body."

¶ 23    The court sentenced defendant to 12 years' imprisonment and ordered restitution to Exner's family. The court specifically noted that it did *not* consider Exner's death in fashioning its sentence because it was an element of the offense. The court continued,

> "I have looked at the factors in aggravation and mitigation. And as it relates to the factors in aggravation, I do find, number one, that the defendant's conduct caused or threatened serious harm. I find that this was due to a conscious disregard for anyone else on the road that day which resulted in [Exner's] death. And I do find that the sentence is necessary to deter others from committing the same crime."

Regarding the mitigation factors, the court rejected defendant's argument that his conduct was a result of circumstances unlikely to recur, citing his continued drug usage. The court recounted defendant's several bond violations and the jail infraction. The court took notice of the evidence that defendant checked himself into treatment at two different rehabilitation facilities.

¶ 24    Thereafter, defendant filed a motion to reconsider his sentence, arguing that (1) the court failed to address his primary argument—that he was unimpaired at the time of the offense; (2) his sentence created an unwarranted sentencing disparity with similarly situated defendants; and (3) other factors in mitigation should be reconsidered because defendant's bond violations did not

8

involve driving, his treatment reduced the risk of recidivism, and he agreed to compensate Exner's family for Exner's funeral expenses.

¶ 25   At the hearing on defendant's motion for reconsideration, the court stated that it "did accept *** as a fact" that defendant was unimpaired at the time of the offense and considered this fact as part of defendant's sentence. The court also accepted that none of the bond violations involved defendant driving. As to defendant's argument that treatment reduced his risk of recidivism, the court noted that the bond violations occurred before, during, and after treatment. Therefore, the court rejected this argument and denied defendant's motion for reconsideration. This appeal followed.

¶ 26                                    II. ANALYSIS

¶ 27   On appeal, defendant argues that the court (1) improperly considered Exner's death, a factor inherent in the offense, in fashioning its sentence and (2) imposed an excessive sentence when considering the aggravating and mitigating factors. We address each argument in turn.

¶ 28                  A. Exner's Death as an Aggravating Factor at Sentencing

¶ 29   Initially, the State contends that defendant's argument that the court improperly considered Exner's death during sentencing was forfeited because it was not raised in his motion to reconsider. However, forfeiture limits the parties, not the court, and we "may look beyond considerations of forfeiture to maintain a sound and uniform body of precedent or where the interests of justice so require." *People v. Jackson*, 2020 IL 124112, ¶ 118. Accordingly, regardless of forfeiture, we address the merits of defendant's argument.

¶ 30   Defendant acknowledges the court's initial statement that it did *not* consider Exner's death in rendering its sentence but challenges its subsequent finding that defendant's conduct caused or threatened serious harm based upon "his conscious disregard for anyone else on the road that day

9

*which resulted in* [*Exner's*] *death.*" (Emphasis added.) From this, defendant concludes that the court did, in fact, expressly and improperly consider Exner's death as an aggravating factor notwithstanding its initial statement to the contrary.

¶ 31        "Generally, a circuit court may not use a factor implicit in the offense for which the defendant was convicted as an aggravating factor at sentencing for that offense. [Citation.] Stated differently, a single factor cannot be used both as an element of an offense and as a basis for imposing 'a harsher sentence than might otherwise have been imposed.' " (Internal quotation marks omitted.) *People v. Morris*, 2014 IL App (1st) 130512, ¶ 51. A trial court *may*, however, consider the manner in which the victim's death occurred, as well as the seriousness, nature, and circumstances of the offense. *People v. Turner*, 2018 IL App (1st) 170204, ¶ 88. It is the ultimate result—here, the victim's death—that may not be considered in sentencing. *Id.* We review *de novo* whether the court considered an improper factor during sentencing. *People v. Minor*, 2019 IL App (3d) 180171, ¶ 28.

¶ 32        There exists a strong presumption that the court utilized proper legal reasoning when fashioning its sentence, and a reviewing court must consider the entire record rather than isolated statements made by the court. *People v. Jeffers*, 2022 IL App (2d) 210236, ¶ 24. Moreover, "[a] court is not required to refrain from mentioning factors that constitute elements of the offense." *Id.*

¶ 33        Here, the court explicitly stated that it did *not* consider Exner's death to be an aggravating factor. "As the court took the time to make that statement, we must assume that it acted accordingly." *Turner*, 2018 IL App (1st) 170204, ¶ 89. Although the court acknowledged that defendant's conduct resulted in Exner's death, this was noted within the court's broader statement that defendant's conduct caused or threatened serious harm in that he displayed a "conscious disregard for *anyone else* on the road that day." (Emphasis added.) The court's focus on "anyone

10

else" illustrates that the primary consideration with respect to this aggravating factor was not Exner's death. Rather, it was the threat of serious harm to *any* motorist that was on the road with defendant that day. "[A] sentencing court may consider the threat to the general public and not just to the named victim." *Jeffers*, 2022 IL App (2d) 210236, ¶ 30. This consideration speaks to the severity of the risk, "including the proximity of defendant's conduct to potential victims *other* than [the victim]." (Emphasis in original.) *Turner*, 2018 IL App (1st) 170204, ¶ 89. Indeed, the court heard Johnson's testimony that he observed defendant's aggressive driving leading up to the collision, which required other motorists to reduce their own speed to avoid colliding with defendant. The court's mere mention of Exner's death does not alter our conclusion. See *Jeffers*, 2022 IL App (2d) 210236, ¶ 24 ("[a] court is not required to refrain from mentioning factors that constitute elements of the offense"). We therefore reject defendant's argument that the court improperly considered Exner's death in rendering its sentence.

¶ 34                                    B. Excessive Sentence

¶ 35        Defendant next challenges his sentence as excessive. In support, defendant first notes that the DUI statute was intended to keep impaired drivers off the road. *People v. Fate*, 159 Ill. 2d 267, 269 (1994). Because the court found that defendant was *not* impaired at the time of the accident, he concludes that a 12-year sentence "is not in keeping with" the spirit and purpose of the DUI law. Second, defendant contends that the court assigned insufficient weight to his "extraordinary cooperation and acceptance of responsibility," and too much weight to his bond violations. Finally, he argues that his sentence was manifestly disproportionate to the offense and "grossly disparate from similarly situated defendants" in other cases.

¶ 36        A defendant's sentence should reflect both the seriousness of the offense and the goal of restoring the defendant to useful citizenship. *People v. Jones*, 2015 IL App (1st) 142597, ¶ 38. The

11

most important factor, however, is the seriousness of the offense. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123. Where the record contains evidence of mitigating factors, we must presume that these factors were considered by the court unless there is some indication, other than the sentence itself, to the contrary. *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 31. The court has broad discretion in weighing and balancing aggravating and mitigating factors. *Id.* "Because the trial court is in the superior position to evaluate factors such as the defendant's credibility, habits, age, demeanor, and general moral character, a reviewing court will not substitute its own judgment merely because it would have weighed the factors differently." *People v. Cruz*, 2019 IL App (1st) 170886, ¶ 50. A court need not explain the weight it assigned to each factor. *Weiser*, 2013 IL App (5th) 120055, ¶ 35.

¶ 37    A sentence that falls within the statutory range is presumed proper unless it "greatly varies [from] the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *Id.* ¶ 33. Here, the statutorily prescribed sentencing range was 3 to 14 years. 625 ILCS 5/11-501(d)(2)(G) (West 2020). A sentence will not be disturbed absent an abuse of discretion. *Cruz*, 2019 IL App (1st) 170886, ¶ 50.

¶ 38    We begin with defendant's assertion that the court's finding regarding his level of impairment should have resulted in a lesser sentence. While defendant correctly states that the DUI statute is "intended to keep drug-impaired drivers off the road," (*Fate*, 159 Ill. 2d at 269) it also recognizes that "while it is possible to determine scientifically the amount of alcohol that renders a driver impaired, it is *not* possible to do the same for drugs." (Emphasis added.) *People v. Martin*, 2011 IL 109102, ¶ 23. The "legal fiction of presumed impairment" is therefore applied to driving with *any* amount of controlled substances in the system. *Id.* As such, notwithstanding the court's finding regarding the level of defendant's impairment, defendant's sentence was not contrary to

12

the spirit and purpose of the law, which is to keep drivers who have *any* amount of controlled substances in their systems off the road.

¶ 39    Moreover, to the extent defendant's level of impairment may have been relevant to the court's consideration of the nature and circumstances of the offense at sentencing, the record demonstrates that the court considered this factor in fashioning its sentence. Essentially, defendant argues that this was a mitigating factor that should have been assigned more weight resulting in a shorter sentence. However, as a reviewing court, we cannot substitute our own judgment and disturb a defendant's sentence merely because we may have weighed the factors differently. *Cruz*, 2019 IL App (1st) 170886, ¶ 50.

¶ 40    Defendant further challenges the weight the court placed on his cooperation with law enforcement following the accident, acceptance of responsibility, and several bond violations. Again, we cannot reweigh the aggravating and mitigating factors to conclude that the court abused its discretion in imposing its sentence simply because they could have been weighed differently. *Id.*; *People v. Fern*, 189 Ill. 2d 48, 53 (1999) ("A reviewing court gives great deference to the trial court's judgment regarding sentencing because the trial judge, having observed the defendant and the proceedings, has a far better opportunity to consider these factors than the reviewing court, which must rely on the 'cold' record.").

¶ 41    Finally, defendant cites several cases in support of his contention that similarly situated defendants in other cases have received lesser sentences, thereby demonstrating that his sentence was manifestly disproportionate to the nature of the offense and grossly disparate relative to other defendants. However, as correctly noted by the State, our supreme court in *Fern* rejected cross-case comparative sentencing, reasoning that it "does not comport with our sentencing scheme's goal of individualized sentencing and would unduly interfere with the sentencing discretion vested

13

in our trial courts." *Id.* at 55. "The fact that a lesser sentence was imposed in another case has no bearing on whether the sentence in the case at hand is excessive *on the facts of that case*." (Emphasis in original.) *Id.* at 56. While defendant correctly states that "fundamental fairness requires that similarly situated defendants not receive grossly disparate sentences," this notion "has been applied *** *only* in the context of codefendants involved in the same crime." (Emphasis added.) *Id.* at 58.

¶ 42 In his reply brief, defendant disagrees with the State's assertion that he has suggested cross-comparative sentencing. Defendant, instead, argues that a court may consider sentences "in other cases for other purposes," such as to demonstrate that the 12-year sentence imposed here does not align with the spirit and purpose of the law. Engaging in such comparisons to determine if a specific sentence aligns with the spirit and purpose of the law, however, similarly runs afoul of the "sentencing scheme's goal of individualized sentencing and would unduly interfere with the sentencing discretion vested in our trial courts." *Id.* at 55. Defendant provides no persuasive support otherwise. Accordingly, the court did not abuse its discretion in sentencing defendant to 12 years' imprisonment.

¶ 43                                III. CONCLUSION

¶ 44 For the reasons stated herein, we affirm the judgment of the circuit court of Du Page County.

¶ 45 Affirmed.

14